UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| v. | § | |
| | § | |
| BRIDGESTONE CORPORATION, | § | Criminal No. _____ |
| | § | |
| | § | |
| Defendant. | § | |

## PLEA AGREEMENT

The United States of America and Bridgestone Corporation ("defendant" or "Bridgestone"), a corporation organized and existing under the laws of Japan, hereby enter into the following Plea Agreement pursuant to Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure ("Fed. R. Crim. P."):

## RIGHTS OF DEFENDANT

1.      The defendant understands its rights:

(a)      to be represented by an attorney;

(b)      to be charged by Indictment;

(c)      as a corporation organized and existing under the laws of Japan, to decline to accept service of the Summons in this case, and to contest the jurisdiction of the United States to prosecute this case against it in the United States District Court for the Southern District of Texas;

(d)      to plead not guilty to any criminal charges brought against it;

(e)     to have a speedy trial by jury, at which it would be presumed not guilty of

the charges and at which the United States would have to prove every essential element

of the charged offenses beyond a reasonable doubt for it to be found guilty;

(f)     to have the trial conducted by a judge sitting without a jury if the

defendant, the United States, and the court all agree;

(g)     to confront and cross-examine witnesses against it, and to put on a defense

at trial and subpoena witnesses in its defense;

(h)     to appeal its conviction if it is found guilty; and

(i)     to appeal the imposition of sentence against it.

## AGREEMENT TO PLEAD GUILTY
## AND WAIVE CERTAIN RIGHTS

2.     The defendant knowingly and voluntarily waives the rights set out in Paragraph

1(b)-(h) above, including all defenses based on venue and all jurisdictional defenses to the

prosecution of this case, and agrees voluntarily to consent to the jurisdiction of the United States

to prosecute this case against it in the United States District Court for the Southern District of

Texas. The defendant waives all defenses based on the statute of limitations with respect to any

prosecution that is not time-barred on the date that this Plea Agreement is signed in the event

that: (a) the conviction is later vacated for any reason; (b) the defendant violates this Plea

Agreement; or (c) the plea is later withdrawn. The defendant also knowingly and voluntarily

waives the right to file any appeal, any collateral attack, or any other writ or motion, including

but not limited to an appeal under 18 U.S.C. § 3742, that challenges the sentence imposed by the

Court if that sentence is consistent with or below the recommended sentence in Paragraph 8 of

this Plea Agreement, regardless of how the sentence is determined by the Court. This agreement

does not affect the rights or obligations of the United States as set forth in 18 U.S.C. § 3742(b),

and the United States is free to take any position on appeal or any other post-judgment matter.

Nothing in this paragraph, however, shall act as a bar to the defendant perfecting any legal

remedies it may otherwise have on appeal or collateral attack respecting claims of ineffective

assistance of counsel or prosecutorial misconduct. The defendant agrees that there is currently

no known evidence of ineffective assistance of counsel or prosecutorial misconduct. Pursuant to

Fed. R. Crim. P. 7(b), the defendant will waive indictment and plead guilty at arraignment to a

two-count Information to be filed in the United States District Court for the Southern District of

Texas. Count 1 of the Information will charge the defendant with participating in a conspiracy to

suppress and eliminate competition by rigging bids, fixing prices and allocating market shares

for sales of marine hose sold in the United States and elsewhere, beginning at least as early as

January 1999 and continuing until in or around May 2007 in unreasonable restraint of foreign

and interstate trade and commerce in violation of the Sherman Antitrust Act, 15 U.S.C. § 1.

Count 2 of the Information will charge the defendant with participating in a conspiracy to violate

the laws of the United States, in violation of 18 U.S.C. § 371, that is, to violate the antibribery

provisions of the Foreign Corrupt Practices Act ("FCPA"), 15 U.S.C. § 78dd-3.

   3.  The defendant agrees to abide by all terms and obligations of this Plea Agreement

as described herein, including but not limited to the following:

     (a)  To plead guilty as set forth in this Plea Agreement;

     (b)  To make a factual admission of guilt to the Court in accordance with Fed.

R. Crim. P. 11, as set forth in Paragraph 4 below;

     (c)  To abide by all sentencing stipulations contained in this Plea Agreement;

(d)      To: (i) appear, through duly appointed representatives, as ordered for all

Court appearances; and (ii) obey any other ongoing Court order in this matter;

(e)      To commit no further crimes;

(f)      To be truthful at all times with the Court;

(g)      To pay the applicable fine and special assessment; and

(h)      To fulfill the obligations described in Attachment B to this Plea

Agreement (with respect to its corporate compliance program).

## FACTUAL BASIS FOR OFFENSES CHARGED

4.      The defendant is pleading guilty because it is in fact guilty of the charges

contained in Counts 1 and 2 of the Information.  In pleading guilty to Counts 1 and 2 of the

Information, the defendant acknowledges and admits that the facts as stated in this Plea

Agreement are true, that it was aware of these facts during the relevant time periods, and that if

the case proceeded to trial, the United States would be able to prove these facts beyond a

reasonable doubt.  The facts set forth in this Plea Agreement are not a complete recitation of all

facts relevant to the underlying criminal conduct or known to the defendant that relate to its

conduct, nor does the factual basis include all the relevant conduct that may be considered by the

Court for sentencing purposes.  The facts are as follows:

### Background

(a)      At all relevant times, defendant was a corporation organized and existing

under the laws of Japan with its principal place of business in Tokyo, Japan.  Defendant's

business includes the manufacture and sale of diversified products ("Diversified

Products"), including Industrial Products, Chemical Products, and Electro-Materials.  The

4

products relevant to Counts 1 and 2 of the Information fell within Diversified Products. The highest level in the relevant corporate reporting chain within Diversified Products was the head of the unit, a position held by a Bridgestone vice president and senior officer who reported directly to the Bridgestone CEO. The next highest level within the corporate reporting chain, and the individual who reported to the unit head, was the head of Bridgestone Industrial Products, Civil Engineering, and Building Materials and Equipment, a position held by a Bridgestone Vice President and Officer. The next highest level was the head of the Industrial Products Division, a position held by a Bridgestone Director. Below the head of the Industrial Products Division was the head of the International Engineered Products Department ("IEPD"), a position held by a Bridgestone General Manager.

(b)     Diversified Products employed over 2,300 individuals. The IEPD General Manager directly supervised approximately 40 employees in Japan. IEPD in Japan was divided into several sections with specified product responsibilities. For example, one section was responsible only for marine hose. Each section had a Section Manager who supervised several "Persons in Charge" who were the main points of contact in Bridgestone for the Bridgestone sales people located outside of Japan.

(c)     The IEPD General Manager was also ultimately responsible for approximately 90 more employees in various Bridgestone wholly owned regional subsidiaries that operated as sales and support offices. These regional subsidiaries included Bridgestone Industrial Products of America, Inc. ("BIPA") which handled sales in North, Central, and South America and was located in Nashville, Tennessee. BIPA

5

was previously known as Bridgestone Engineered Products Company, Inc., and in this

Plea Agreement and Information, references to BIPA are inclusive of this and any other

former iteration.  In addition to its administrative office in Nashville, Tennessee, BIPA

had a sales office in Houston, Texas, through which it handled all of its Latin America

sales of industrial products.

      (d)     As described more fully below, the IEPD Section Managers, Persons in

Charge, employees in the regional subsidiaries, the General Manager, and sometimes his

supervisors, determined what prices defendant would quote to customers and made the

sales decisions for industrial products.  In addition to marine hose, IEPD also sold,

among other industrial products, marine fenders (used in ports), conveyor belts, and

rubber dams.

### Count 1

      (e)     For purposes of Count 1 of the Plea Agreement, the "relevant period" is

the period beginning at least as early as January 1999 and continuing until in or around

May 2007.  During the relevant period, the defendant manufactured marine hose in Japan,

and sold marine hose in the United States and elsewhere outside Japan through its IEPD.

Marine hose is a flexible rubber hose used to transfer oil between tankers and storage

facilities and/or buoys.  To sell its industrial products throughout the world, defendant

coordinated with its regional subsidiaries, including BIPA.

      (f)     During the relevant period, the defendant, through certain officers of

Diversified Products and officers and employees of IEPD, participated in a conspiracy

among major marine hose manufacturers, the primary purpose of which was to suppress

6

and eliminate competition by rigging bids, fixing prices and allocating market shares for sales of marine hose sold in the United States and elsewhere. During the relevant period, the volume of U.S. commerce attributable to the defendant totaled at least $24 million.

(g)     In furtherance of the conspiracy, the defendant, through certain officers and employees of IEPD, engaged in discussions and attended meetings with representatives of other marine hose manufacturers. During such meetings and discussions, the co-conspirators agreed to rig bids, fix prices and allocate market shares for the sale of marine hose in the United States and elsewhere. Each of the conspiring manufacturers provided a co-conspirator, who acted as a coordinator, with information about upcoming marine hose jobs. The coordinator then designated, based on rules agreed to by the conspirators, which of the conspiring manufacturers would win the job, referring to the winning conspirator as "champion." After the champion had been designated, the coordinator provided the other conspirators with instructions regarding how much to bid on the job to ensure that the designated champion would win the job.

(h)     During the relevant period, marine hose sold by one or more of the conspirator firms, and equipment and supplies necessary to the production and distribution of marine hose, as well as payments for marine hose, traveled in interstate and foreign commerce. The business activities of the defendant and co-conspirators in connection with the manufacture and/or sale of marine hose affected by this conspiracy were within the flow of, and substantially affected, interstate and foreign trade and commerce.

(i)     Acts in furtherance of this conspiracy were carried out in the Southern

District of Texas during the relevant period.  Several corporate co-conspirators, including

defendant's subsidiary BIPA, had operations in Houston, within the Southern District of

Texas.  Additionally, on at least one occasion, members of the conspiracy met in Houston

to discuss implementing the conspiracy.

### Count 2

(j)     For purposes of Count 2 of the Plea Agreement, the "relevant period" is

the period beginning at least as early as 1999 and continuing until in or around May

2007.  To sell its industrial products throughout the world, defendant coordinated with

and acted through its regional subsidiaries, including its U.S. subsidiary, BIPA.  BIPA

sold industrial products to customers within its assigned regions, including to foreign

state-owned customers.  On behalf of defendant, BIPA typically entered into

commission-based contracts with local sales agents in the countries in which it sold

products.  BIPA, for example, entered into contracts with local sales agents in Argentina,

Brazil, Ecuador, Mexico, and Venezuela, among other countries.  Typically, BIPA's local

sales agents were responsible for developing relationships with, and keeping apprised of,

upcoming work with potential customers in their respective territories.  Many of these

local sales agents had relationships with officials in the state-owned entities that were

often defendant's customers for industrial products.

*Corrupt Payments in Latin America*

(k)     For a substantial period of time, including during the relevant period, defendant authorized and approved corrupt payments to be made through BIPA's local sales agents to foreign government officials employed at state-owned customers in various countries in Latin America in order to secure contracts for its industrial products, including marine hose.

(l)     To secure projects in Latin America, and in Mexico in particular, defendant authorized and approved corrupt payments to be made through BIPA's local sales agents to foreign government officials employed at state-owned entities. While the specifics varied among the different industrial products, most affected sales within IEPD generally followed a similar pattern. Local sales agents in various countries in Latin America gathered information related to potential projects and relayed that information to their respective contacts at BIPA. BIPA then forwarded the information provided by the local agents to the IEPD employee in Japan responsible for the particular product, typically to the relevant Person in Charge.

(m)     The local agents often agreed to pay officials within the state-owned customer a percentage of the total value of the proposed deal. Employees of BIPA and IEPD in Japan were aware of and authorized these payments.

(n)     Employees of BIPA and IEPD also took steps to conceal these payments. For example, to avoid creating a written record of the corrupt payments, some of the facsimiles sent from BIPA to defendant's IEPD that contained details of the payments – often including the percentage amounts of the payments and the individuals within the

9

customer to whom the payments would be made – reflected the handwritten notation: "Read and Destroy." In addition, on many occasions, defendant's IEPD and BIPA employees made a point of addressing any issues surrounding the corrupt payments by telephone rather than in writing.

(o)     Defendant's IEPD employees within the marine hose section, including the Persons in Charge, Section Manager, or the IEPD General Manager, indicated their approval of a proposed marine hose deal by stamping their names on a cost and profit analysis spreadsheet that outlined the terms of the particular deal. At IEPD in Japan, this spreadsheet was called a Kessai Sho. The Kessai Sho would include the expected sales price and/or profit and would sometimes include the commission percentage for the particular deal. In certain circumstances, the IEPD General Manager sought the approval of the head of the Industrial Products Division for deals that included corrupt payments. The Kessai Sho was kept within the IEPD. After defendant agreed to authorize and approve corrupt payments to employees of the customer to secure a project, BIPA would place the bid through the local sales agent. Typically, if BIPA secured the project, it would pay the local sales agent a "commission," which included not only the local sales agent's actual commission, but also whatever corrupt payments were to be paid to employees of the customer. The local sales agent would then be responsible for passing the agreed-upon corrupt payment to the employees of the customer.

(p)     During the relevant period, defendant conspired with BIPA employees and agents and others to make corrupt payments to foreign government officials to secure business and contracts for the purchase of IEPD products, including the purchase of

10

marine hose. During the relevant period, defendant authorized and approved more than $2 million in corrupt payments to be made through BIPA's local sales agents to foreign government officials employed at state-owned customers. These corrupt payments resulted in profits to defendant and BIPA of approximately $17,103,694.

(q)     In furtherance of the conspiracy described in Paragraph 4(k)-(p), the following acts, among others, occurred within the Southern District of Texas and elsewhere:

(r)     On or about May 31, 2004, the marine hose section manager of IEPD in Japan sent an e-mail to a BIPA employee in Houston, Texas, in connection with instructions for how the BIPA employee's "source" at Petroleos Mexicanos ("PEMEX") should assist Bridgestone in securing a potential project with PEMEX.

(s)     On or about June 23, 2004, a Person in Charge of the marine hose section within IEPD in Japan e-mailed a BIPA employee in Houston, Texas, in connection with a potential project with PEMEX, instructing the employee to "not mention any commission issue in your mails from now on" and instead to "communicate by tel or fax about this issue."

(t)     On or about October 17, 2005, a BIPA employee in Houston, Texas, sent an e-mail to a Person in Charge of the marine hose section within IEPD in Japan suggesting that they invite an employee from PEMEX to Japan to strengthen the relationship and "have him at our side."

(u)     On or about September 5, 2006, a BIPA employee in Houston, Texas, faxed a printed out e-mail to a Person in Charge of the marine hose section within IEPD

11

in Japan regarding a project with PEMEX, which noted that 24% should be reserved for commissions, including 5% for "top level" and 5% for other employees from the customer, and included an instruction to "**READ AND DESTROY**."

(v)     On or about September 19, 2006, a BIPA employee in Houston, Texas, sent an e-mail to a Person in Charge of the marine hose section within IEPD in Japan providing confidential information that the BIPA employee had received from employees of PEMEX regarding the bidding for a project with that customer.

(w)     On or about September 19, 2006, a BIPA employee in Houston, Texas, and a Person in Charge of the marine hose section within IEPD in Japan communicated via e-mail regarding which employees from PEMEX could help Bridgestone more easily obtain future projects with the customer.

(x)     On or about September 19, 2006, a BIPA employee in Houston, Texas, sent an e-mail to a Person in Charge of the marine hose section within IEPD in Japan stating the steps that certain employees from PEMEX were taking to ensure that Bridgestone secured a project with that customer.

(y)     On or about January 25, 2007, BIPA sent an invoice from its office in Nashville, Tennessee, via mail to PEMEX in the amount of $324,200 in connection with a project secured with the help of employees of the customer who were to receive "commission" payments from Bridgestone.

12

## POSSIBLE MAXIMUM SENTENCE

5.      For Count 1, the defendant understands that the statutory maximum penalty that may be imposed against it upon conviction for a violation of Section One of the Sherman Antitrust Act is a fine in an amount equal to the greatest of:

(a)      $100 million (15 U.S.C. § 1);

(b)      twice the gross pecuniary gain the conspirators derived from the crime (18 U.S.C. § 3571(c) and (d)); or

(c)      twice the gross pecuniary loss caused to the victims of the crime by the conspirators (18 U.S.C. § 3571(c) and (d)).

6.      For Count 2, the defendant understands that the statutory maximum penalty that may be imposed against it upon conviction for a violation of 18 U.S.C. § 371 is a fine in an amount equal to the greatest of:

(a)      $500,000; or

(b)      twice the gross pecuniary gain the conspirators derived from the crime, or twice the gross pecuniary loss caused to the victims of the crime by the conspirators (18 U.S.C. § 3571(c) and (d)).

7.      In addition, the defendant understands that:

(a)      pursuant to 18 U.S.C. § 3561(c)(1), the Court may impose a term of probation of at least one year, but not more than five years;

(b)      pursuant to §8B1.1 of the United States Sentencing Guidelines ("U.S.S.G.," "Sentencing Guidelines," or "Guidelines") or 18 U.S.C. § 3563(b)(2) or 3663(a)(3), the Court may order it to pay restitution to the victims of the offense; and

13

(c)     pursuant to 18 U.S.C. § 3013(a)(2)(B), the Court is required to order the defendant to pay a $400 special assessment for each Count upon conviction for the charged crimes.

## SENTENCING GUIDELINES

8.     The defendant understands that the Sentencing Guidelines are advisory, not mandatory, but that the Court must consider the Guidelines in effect on the day of sentencing, along with the other factors set forth in 18 U.S.C. § 3553(a), in determining and imposing sentence.  The defendant understands that the Guidelines determinations will be made by the Court by a preponderance of the evidence standard.  The defendant understands that although the Court is not ultimately bound to impose a sentence within the applicable Guidelines range, its sentence must be reasonable based upon consideration of all relevant sentencing factors set forth in 18 U.S.C. § 3553(a).  Pursuant to U.S.S.G. §1B1.8, the United States agrees that self-incriminating information that the defendant provides to the United States pursuant to this Plea Agreement will not be used in determining the defendant's applicable Guidelines range, except to the extent provided in U.S.S.G. §1B1.8(b).

9.     The United States and the defendant agree that Counts 1 and 2 should not be grouped together as "closely related counts" under U.S.S.G. §3D1.2, and pursuant to U.S.S.G. §6B1.4, enter into the following stipulations:

(a)     **Count 1**

(i)     The base fine for the offense to which the defendant is pleading guilty, as established by U.S.S.G. §2R1.1(d)(1), is $4.8 million.

14

(ii)     During the relevant period, Diversified Products had more than 1,000, but fewer than 5,000, employees, and a high-level individual within Diversified Products participated in, condoned, or was willfully ignorant of the offense, within the meaning of U.S.S.G. §8C2.5(b)(2), which increases the defendant's culpability score by 4 points.

(iii)     The defendant has fully cooperated in the investigation and clearly demonstrated recognition and affirmative acceptance of responsibility for its criminal conduct, within the meaning of U.S.S.G. §8C2.5(g)(2), which decreases the defendant's culpability score by 2 points.  However, should the United States obtain or receive additional evidence or information prior to sentencing that, in its sole discretion, it determines to be credible and materially in conflict with this stipulation, then the United States shall no longer be bound by this stipulation.

(iv)     Based on the foregoing, the defendant's U.S.S.G. §8C2.5 culpability score is 7, which yields minimum and maximum fine multipliers, as determined in U.S.S.G. § 8C2.6, of 1.40 and 2.80.  Therefore the defendant's appropriate Guidelines fine range is $6.72 million to $13.44 million.

(b)     **Count 2**

(i)     The base offense level for the offense to which the defendant is pleading guilty, as established by U.S.S.G. §2C1.1(a)(2), is 12.

(ii)     Because the offense involved more than one bribe, the offense level is increased 2 levels pursuant to U.S.S.G. §2C1.1(b)(1).

(iii)     Because the benefit to defendant and BIPA was approximately

15

$17,103,694, the offense level is increased by 20 levels pursuant to U.S.S.G. §2C1.1(b)(2) and U.S.S.G. §2B1.1(b)(1)(K), resulting in an offense level of 34.

(iv)     The base fine for the offense to which the defendant is pleading guilty, as established by U.S.S.G. §8C2.4(a)(1) and U.S.S.G. §8C2.4(d), is $28,500,000.

(v)     During the relevant period, Diversified Products had more than 1,000, but fewer than 5,000, employees, and a high-level individual within Diversified Products participated in, condoned, or was willfully ignorant of the offense, within the meaning of U.S.S.G. §8C2.5(b)(2), which increases the defendant's culpability score by 4 points.

(vi)     The defendant has fully cooperated in the investigation and clearly demonstrated recognition and affirmative acceptance of responsibility for its criminal conduct, within the meaning of U.S.S.G. §8C2.5(g)(2), which decreases the defendant's culpability score by 2 points.  However, should the United States obtain or receive additional evidence or information prior to sentencing that it, in its sole discretion, determines to be credible and materially in conflict with this stipulation, the United States shall no longer be bound by this stipulation.

(vii)     Based on the foregoing, the defendant's U.S.S.G. §8C2.5 culpability score is 7, which yields minimum and maximum fine multipliers, as determined in U.S.S.G. § 8C2.6, of 1.40 and 2.80.  Therefore the defendant's appropriate Guidelines fine range is $39,900,000 to $79,800,000.

(c)     Pursuant to U.S.S.G. § 3D1.4(c), the combined offense level is 34, and the applicable Guidelines range is the range for Count 2: $39,900,000-$79,800,000.

## SENTENCING AGREEMENT

10.     Pursuant to Fed. R. Crim. P. 11(c)(1)(C), the United States and the defendant agree that the appropriate disposition of this case is, and agree to recommend jointly, that the Court impose a sentence requiring the defendant to pay to the United States a criminal fine of $28,000,000, payable in full before the tenth (10th) day after the date of judgment ("the recommended sentence").  The parties have agreed that a fine of $28,000,000 is the appropriate disposition based on the following factors and those in 18 U.S.C. § 3553(a): (1) defendant's cooperation has been extraordinary, including conducting an extensive worldwide internal investigation, voluntarily making Japanese and other employees available for interviews, and collecting, analyzing, and organizing voluminous evidence and information for the United States; (2) defendant has engaged in extensive remediation, including dismantling its IEPD, closing its Houston BIPA office, terminating many of its third-party agents, and taking remedial actions with respect to employees responsible for many of the corrupt payments; and (3) defendant has committed to continue to enhance its compliance program and internal controls, including ensuring that its compliance program satisfies the minimum elements set forth in Attachment B to this Plea Agreement.  The parties agree that the recommended sentence set forth in this Plea Agreement is reasonable, and not to seek any adjustments to, or departures from, the agreed-upon fine of $28,000,000 as set forth herein.

(a)     The defendant acknowledges that no tax deduction may be sought in connection with the payment of the fine.  The defendant further understands that the

Court will order it to pay a $400 special assessment for each Count, pursuant to 18 U.S.C.

§ 3013(a)(2)(B), in addition to any fine imposed.

      (b)     Both parties will recommend that no term of probation be imposed, but the

defendant understands that the Court's denial of this request will not void this Plea

Agreement.

      (c)     The United States and the defendant jointly submit that this Plea

Agreement, together with the record that will be created by the United States and the

defendant at the plea and sentencing hearings, and the further disclosure described in

Paragraph 11, will provide sufficient information concerning the defendant, the crime

charged in this case, and the defendant's role in the crime to enable the meaningful

exercise of sentencing authority by the Court under 18 U.S.C. § 3553.

      (d)     The United States and defendant agree, subject to the Court's approval, to

waive the requirement for a presentence report, pursuant to Federal Rule of Criminal

Procedure 32(c)(1)(A), based on a finding by the Court that the record contains

information sufficient to enable the Court to meaningfully exercise its sentencing power.

However, the parties agree that in the event the Court orders the preparation of a

presentence report prior to sentencing, such order will not affect any of the terms of the

Plea Agreement. The parties further agree to request that the Court combine the entry of

plea and sentencing into one proceeding. However, the parties agree that in the event that

the Court orders that the entry of the guilty plea and the sentencing occur at separate

proceedings, such an order will not affect the agreement set forth herein. Additionally, if

the Court directs the preparation of a presentence report, the United States will fully

inform the preparer of the presentence report and the Court of the facts and law related to the defendant's case.

11.    Subject to the full, truthful, and continuing cooperation of the defendant described in Paragraph 16 of this Plea Agreement, and before sentencing in the case, the United States will fully advise the Court and the Probation Office of the fact, manner, and extent of the defendant's cooperation and its commitment to prospective cooperation with the United States' investigation and prosecutions, all material facts relating to the defendant's involvement in the charged offense, and all other relevant conduct.

12.    The United States and the defendant understand that the Court retains complete discretion to accept or reject the recommended sentence provided for in Paragraph 10 of this Plea Agreement.

(a)    If the Court does not accept the recommended sentence, the United States and the defendant agree that this Plea Agreement, except for Paragraph 12(b) below, shall be rendered void.

(b)    If the Court does not accept the recommended sentence, the defendant will be free to withdraw its guilty plea (Fed. R. Crim. P. 11(c)(5) and (d)). If the defendant withdraws its plea of guilty, this Plea Agreement, the guilty plea, and any statement made in the course of any proceedings under Fed. R. Crim. P. 11 regarding the guilty plea or this Plea Agreement or made in the course of plea discussions with an attorney for the government shall not be admissible against the defendant in any criminal or civil proceeding, except as otherwise provided in Fed. R. Evid. 410. In addition, the defendant agrees that, if it withdraws its guilty plea pursuant to this subparagraph of the Plea

19

Agreement, the statute of limitations period for any offense referred to in Paragraph 16 of this Plea Agreement shall be tolled for the period between the date of the signing of the Plea Agreement and the date the defendant withdrew its guilty plea or for a period of sixty (60) days after the date of the signing of the Plea Agreement, whichever period is greater.

13.    In light of the availability of civil causes of actions, which potentially provide for a recovery of a multiple of actual damages, the United States agrees that it will not seek a restitution order for the offense charged in Count 1 of the Information.

14.    The defendant agrees that in the event it sells, merges, or transfers all or substantially all of its business operations as they exist as of the date of this Plea Agreement, whether such sale(s) is/are structured as a stock or asset sale, merger, or transfer, it shall include in any contract for sale, merger, or transfer a provision fully binding the purchaser(s) or any successor(s) in interest thereto to the obligations described in this Plea Agreement.

15.    The defendant agrees that if it issues a press release in connection with this Plea Agreement, the defendant shall first consult with the United States to determine whether (a) the text of the release is true and accurate with respect to matters between the United States and the defendant; and (b) the United States has no objection to the release.

## DEFENDANT'S COOPERATION

16.    The defendant and its subsidiaries involved in the production or sale of marine hose or other industrial products  (collectively "related entities") will cooperate fully and truthfully with the United States in the prosecution of this case, the conduct of the current federal investigation of violations of federal antitrust and related criminal laws involving the

manufacture or sale of marine hose, the United States' investigations and prosecutions of violations of the Foreign Corrupt Practices Act and any other federal investigation resulting therefrom, and any litigation or other proceedings arising or resulting from any such investigation to which the United States is a party (collectively, "Federal Proceedings"). The full, truthful, and continuing cooperation of the defendant and its related entities shall include, but not be limited to:

> (a)    producing to the United States all non-privileged documents, information, and other materials wherever located (and with translations into English), in the possession, custody, or control of the defendant, or any of its related entities, requested by the United States in connection with any Federal Proceedings; and

> (b)    using its best efforts to secure the full, truthful, and continuing cooperation,

as defined in Paragraph 17 of this Plea Agreement, of the current directors, officers, and employees of the defendant or any of its related entities as may be requested by the United States, including making these persons available in the United States and at other mutually agreed-upon locations, at the defendant's expense, for interviews and the provision of testimony in grand jury, trial, and other judicial proceedings in connection with any Federal Proceedings, except that the defendant is not required to do so with respect to Misao Hioki and Yasuo Asami in connection with any federal investigation of violations of federal antitrust and related criminal laws involving the manufacture or sale of marine hose.

21

17.     The full, truthful, and continuing cooperation of each person described in Paragraph 16(b) above will be subject to the procedures and protections of this paragraph, and shall include, but not be limited to:

(a)     producing in the United States and at other mutually agreed-upon locations all non-privileged documents, including claimed personal documents, and other materials, wherever located (and with translations into English), requested by attorneys and agents of the United States;

(b)     making himself or herself available for interviews in the United States and at other mutually agreed-upon locations, not at the expense of the United States, upon the request of attorneys and agents of the United States;

(c)     responding fully and truthfully to all inquiries of the United States in connection with any Federal Proceedings, without falsely implicating any person or intentionally withholding any information, subject to the penalties of making false statements (18 U.S.C. § 1001) and obstruction of justice (18 U.S.C. § 1503, *et seq.*);

(d)     otherwise voluntarily providing the United States with any non-privileged material or information not requested in (a) – (c) of this paragraph that he or she may have that is related to any Federal Proceedings;

(e)     when called upon to do so by the United States in connection with any Federal Proceedings, testifying in grand jury, trial, and other judicial proceedings in the United States fully, truthfully, and under oath, subject to the penalties of perjury (18 U.S.C. § 1621), making false statements or declarations in grand jury or court

22

proceedings (18 U.S.C. § 1623), contempt (18 U.S.C. §§ 401-402), and obstruction of justice (18 U.S.C. § 1503, *et seq.*); and

(f)    agreeing that, if the agreement not to prosecute him or her for antitrust and related offenses in Paragraph 20(a) of this Plea Agreement is rendered void under Paragraph 20(c), the statute of limitations period for any Relevant Offense as defined in Paragraph 20(a) shall be tolled as to him or her for the period between the date of the signing of this Plea Agreement and six (6) months after the date that the United States gave notice of its intent to void its obligations to that person under the Plea Agreement.

## UNITED STATES' AGREEMENT

18.    Upon acceptance of the guilty plea called for by this Plea Agreement and the imposition of the recommended sentence, and subject to the cooperation requirements of Paragraph 16 of this Plea Agreement, the United States agrees that it will not bring further criminal charges against the defendant or any of its related entities for any act or offense committed before the date of this Plea Agreement that was undertaken in furtherance of an antitrust conspiracy involving the manufacture or sale of marine hose or in furtherance of the conspiracy to violate the Foreign Corrupt Practices Act described in the Information and Paragraph 4 of this Plea Agreement.  The non-prosecution terms of this paragraph do not apply to civil matters of any kind, to any violation of the federal tax or securities laws, or to any crime of violence.

19.    Except as provided in Paragraph 20 below with respect to acts or offenses related to the antitrust conspiracy involving the manufacture or sale of marine hose, this Plea Agreement will not close or preclude the investigation or prosecution of any natural persons, including any

current or former officers, directors, employees, stockholders, consultants, or agents of the defendant.

20.   The United States agrees to the following with respect to acts or offenses related to the antitrust conspiracy involving the manufacture or sale of marine hose:

(a)   Upon the Court's acceptance of the guilty plea called for by this Plea Agreement and the imposition of the recommended sentence and subject to the exceptions noted in Paragraph 20(c), the United States will not bring criminal charges against any current or former director, officer, or employee of the defendant or its related entities for any act or offense committed before the date of this Plea Agreement and while that person was acting as a director, officer, or employee of the defendant or its related entities that was undertaken in furtherance of an antitrust conspiracy involving the manufacture or sale of marine hose ("Relevant Offense"), except that the protections granted in this paragraph shall not apply to Misao Hioki and Yasuo Asami;

(b)   Should the United States determine that any current director, officer, or employee of the defendant or its related entities may have information relevant to any Federal Proceedings, the United States may request that person's cooperation under the terms of this Plea Agreement by written request delivered to counsel for the individual (with a copy to the undersigned counsel for the defendant) or, if the individual is not known by the United States to be represented, to the undersigned counsel for the defendant;

(c)   If any person requested to provide cooperation under Paragraph 20(b) fails to comply with his or her obligations pertaining to any Relevant Offense under Paragraph

17, then the terms of this Plea Agreement as they pertain to that person, and the agreement not to prosecute that person granted in this Plea Agreement, shall be rendered void;

      (d)     Except as provided in Paragraph 20(e), information provided by a person described in Paragraph 20(b) to the United States under the terms of this Plea Agreement pertaining to any Relevant Offense, or any information directly or indirectly derived from that information, may not be used against that person in a criminal case relating to any Relevant Offense, except in a prosecution for perjury (18 U.S.C. § 1621), making a false statement or declaration (18 U.S.C. §§ 1001, 1623), or obstruction of justice (18 U.S.C. § 1503, *et seq.*);

      (e)     If any person who provides information to the United States under this Plea Agreement fails to comply fully with his or her obligations pertaining to any Relevant Offense under Paragraph 17 of this Plea Agreement, the agreement in Paragraph 20(d) not to use that information or any information directly or indirectly derived from it against that person in a criminal case relating to any Relevant Offense shall be rendered void;

      (f)     The non-prosecution terms of this paragraph do not apply to civil matters of any kind, to any violation of the FCPA, conspiracy to violate the FCPA, or related violations, to any violation of the federal tax or securities laws, or to any crime of violence; and

(g)    Documents provided under Paragraphs 16(a) and 17(a) shall be deemed responsive to outstanding grand jury subpoenas issued to the defendant or any of its related entities.

21.    The United States agrees that when any person travels to the United States at the request of the Antitrust Division for interviews, grand jury appearances, or court appearances pursuant to this Plea Agreement, or for meetings with counsel in preparation therefor, the United States will take no action, based upon any Relevant Offense or the conspiracy to violate the FCPA and related offenses, to subject such person to arrest, detention, or service of process, or to prevent such person from departing the United States. This paragraph does not apply to an individual's commission of perjury (18 U.S.C. § 1621), making false statements (18 U.S.C. § 1001), making false statements or declarations in grand jury or court proceedings (18 U.S.C. § 1623), obstruction of justice (18 U.S.C. § 1503, *et seq.*), or contempt (18 U.S.C. §§ 401-402) in connection with any testimony or information provided or requested in any Federal Proceeding.

22.    The defendant understands that it may be subject to administrative action by federal or state agencies other than the United States Department of Justice, Antitrust Division and Criminal Division, based upon the conviction resulting from this Plea Agreement, and that this Plea Agreement in no way controls whatever action, if any, other agencies may take. However, the United States agrees that, if requested, it will advise the appropriate officials of any governmental agency considering such administrative action of the fact, manner, and extent of the cooperation of the defendant and its related entities as a matter for that agency to consider before determining what administrative action, if any, to take.

## REPRESENTATION BY COUNSEL

23.    The defendant has been represented by counsel and is fully satisfied that its

attorneys have provided competent legal representation.  The defendant has thoroughly reviewed

this Plea Agreement and acknowledges that counsel has advised it of the nature of the charges,

any possible defenses to the charges, and the nature and range of possible sentences.

## VOLUNTARY PLEA

24.    The defendant's decision to enter into this Plea Agreement and to tender a plea of

guilty is freely and voluntarily made and is not the result of force, threats, assurances, promises,

or representations other than the representations contained in this Plea Agreement.  The United

States has made no promises or representations to the defendant as to whether the Court will

accept or reject the recommendations contained within this Plea Agreement.

## VIOLATION OF PLEA AGREEMENT

25.    The defendant agrees that, should the United States determine in its sole

discretion, during the period that any Federal Proceeding is pending, that the defendant or any of

its related entities has failed to provide full and truthful cooperation, as described in Paragraph

16 of this Plea Agreement, or has otherwise violated any provision of this Plea Agreement, the

United States may notify counsel for the defendant in writing by personal or overnight delivery

or facsimile transmission and may also notify counsel by telephone of its intention to void any of

its obligations under this Plea Agreement (except its obligations under this paragraph), and the

defendant and its related entities shall be subject to prosecution for any federal crime of which

the United States has knowledge including, but not limited to, the substantive offenses relating to

the investigation resulting in this Plea Agreement.  The defendant and its related entities agree

that, in the event that the United States is released from its obligations under this Plea Agreement and brings criminal charges against the defendant or its related entities for any offense referred to in Paragraph 18 of this Plea Agreement, the statute of limitations period for such offense shall be tolled for the period between the date of the signing of this Plea Agreement and six (6) months after the date the United States gave notice of its obligations under this Plea Agreement.

26.     In the event that the Department determines that the defendant has breached this Agreement, the Department agrees to provide the defendant with written notice of such breach prior to instituting any prosecution resulting from such breach.  The defendant shall, within (30) days of receipt of such notice, have the opportunity to respond to the Department to explain the nature and the circumstances of such breach, as well as the actions that the defendant has taken to address and remediate the situation, which explanation the Department shall consider in determining whether to institute such a prosecution.

27.     The defendant understands and agrees that in any further prosecution of it or its related entities resulting from the release of the United States from its obligations under this Plea Agreement, because of the defendant's or its related entities' violation of the Plea Agreement, any documents, statements, information, testimony, or evidence provided by it, its related entities, or current directors, officers, or employees of it or its related entities to attorneys or agents of the United States, federal grand juries, or courts, and any leads derived therefrom, may be used against it or its related entities in any such further prosecution.  In addition, the defendant unconditionally waives its right to challenge the use of such evidence in any such further prosecution, notwithstanding the protections of Fed. R. Evid. 410.

28

## ENTIRETY OF AGREEMENT

28.     This Plea Agreement constitutes the entire agreement between the United States and the defendant concerning the disposition of the criminal charges in this case. This Plea Agreement cannot be modified except in writing, signed by the United States and the defendant.

29.     The undersigned agrees and represents that it has the full legal right, power, and authority to enter into and perform all obligations under this Plea Agreement on behalf of the defendant as evidenced by the Resolution of the Board of Directors of the defendant attached as Attachment A to, and incorporated by reference in, this Plea Agreement.

30.    A facsimile or PDF signature shall be deemed an original signature for the purpose of executing this Plea Agreement.  Multiple signature pages are authorized for the purpose of executing this Plea Agreement.

DATED: 9-9-11

Respectfully submitted,

BY: _____
For Bridgestone Corporation
Shingo Kubota
Director of the Office of Legal Affairs

_____
John K. Carroll, Esq.
Warren Feldman, Esq.
Skadden, Arps, Slate, Meagher & Flom LLP
Four Time Square
New York, New York 10036

*Counsel for Defendant*

BY: _____
Mark C. Grundvig
Craig Lee
Attorneys, Antitrust Division
U.S. Department of Justice
National Criminal Enforcement Section
450 5th Street, NW, Suite 11300
Washington, DC 20530
202-305-1878

Denis J. McInerney
Chief, Fraud Section
Criminal Division
United States Department of Justice

BY: _____
William J. Stuckwisch
Assistant Chief
Fraud Section
Criminal Division
U.S. Department of Justice
1400 New York Avenue NW
Washington, DC 20530

BY: _____
Daniel S. Kahn
Trial Attorney
Fraud Section
Criminal Division
U.S. Department of Justice
1400 New York Avenue NW
Washington, DC 20530

30

## CERTIFICATE BY THE DIRECTOR OF OFFICE OF LEGAL AFFAIRS

I have read this Plea Agreement and carefully reviewed every part of it with counsel for Bridgestone Corporation ("Bridgestone"). I understand the terms of this Plea Agreement and voluntarily agree, on behalf of Bridgestone, to each of its terms. Before signing this Plea Agreement on behalf of Bridgestone, I consulted with counsel for Bridgestone. Counsel fully advised me of the rights of Bridgestone, of possible defenses, of the Sentencing Guidelines' provisions, and of the consequences of entering into this Plea Agreement.

I have carefully reviewed this Plea Agreement with the Board of Directors of Bridgestone. I have advised, and caused outside counsel for Bridgestone to advise, the Board fully of the rights of Bridgestone, of possible defenses, of the Sentencing Guidelines' provisions, and of the consequences of entering into the Plea Agreement.

No promises or inducements have been made other than those contained in this Plea Agreement. Furthermore, no one has threatened or forced me, or to my knowledge any person authorizing this Plea Agreement on behalf of Bridgestone, in any way to enter into this Plea Agreement. I am also satisfied with counsel's representation in this matter.

I certify that I am the Director of Office of Legal Affairs of

Bridgestone and that I have been duly authorized by Bridgestone to execute

this Plea Agreement on behalf of Bridgestone.

Date: September 12, 2011

BRIDGESTONE CORPORATION

By: _____

Shingo Kubota
Director of Office of Legal Affairs

# CERTIFICATE OF COUNSEL

We are counsel for Bridgestone Corporation ("Bridgestone") in the matter covered by this Plea Agreement. In connection with such representation, we have examined relevant Bridgestone documents and have discussed this Plea Agreement with the Board of Directors of Bridgestone and authorized representatives of Bridgestone. Based on our review of the foregoing materials and discussions, we are of the opinion that Bridgestone's representatives have been duly authorized to enter into this Plea Agreement on behalf of Bridgestone. This Plea Agreement has been duly and validly authorized, executed, and delivered on behalf of Bridgestone and is a valid and binding obligation of Bridgestone. Further, we have carefully reviewed every part of this Plea Agreement with the Board of Directors and the Director of Office of Legal Affairs of Bridgestone. We have fully advised them of Bridgestone's rights, of possible defenses, of the Sentencing Guidelines' provisions, and of the consequences of entering into this Plea Agreement. To our knowledge, Bridgestone's decision to enter into this Plea Agreement is an informed and voluntary one.

Date: September 12, 2011        By: _____

John Carroll
Warren Feldman
Skadden, Arps, Slate, Meagher & Flom LLP
Four Times Square
New York, New York 10036

## ATTACHMENT A

## CERTIFICATE REGARDING CORPORATE RESOLUTIONS

**WHEREAS**, Bridgestone Corporation (the "Company") has been engaged in discussions with the Antitrust Division and the Fraud Section of the Criminal Division of the United States Department of Justice (the "Department") in connection with issues relating to allegations concerning an antitrust conspiracy involving marine hose sales and a conspiracy to make certain illegal payments to foreign officials to obtain and retain business for the Company;

**WHEREAS**, in order to resolve such discussions, it is proposed that the Company enter into a certain agreement with the Department; and

**WHEREAS**, the Company's Director of Office of Legal Affairs, together with outside counsel for the Company, have advised the Board of Directors of the Company of its rights, possible defenses, the United States Sentencing Guidelines' provisions, and the potential consequences of entering into such agreement with the Department;

Therefore, during the meeting that was held on September 12, 2011, the Board of Directors has **RESOLVED** that:

1.      The Company will (a) acknowledge the filing in the United States District Court for the Southern District of Texas of the two-count Information charging the Company with participating in a conspiracy to violate the Sherman Antitrust Act, 15 U.S.C. § 1 (Count 1); and conspiracy to commit an offense against the United States in violation of 18 U.S.C. § 371, namely to violate the Foreign Corrupt Practices Act (15 U.S.C. §78dd-3) (Count 2); (b) waive indictment on such charges and enter into a Plea Agreement with the Department; and (c) agree to pay a monetary penalty of $28,000,000 to the United States Treasury with respect to the conduct described in the Information;

2.      The Company's Director of Office of Legal Affairs is hereby authorized, empowered, and directed, on behalf of the Company, to execute the Plea Agreement substantially in such form as reviewed by this Board of Directors at this meeting with such changes as the Director of Office of Legal Affairs may approve;

3.      The Director of Office of Legal Affairs is hereby authorized, empowered, and directed to take any and all actions as may be necessary or appropriate, and to approve the forms, terms, or provisions of any agreement or other documents as may be necessary or appropriate to carry out and effectuate the purpose and intent of the foregoing resolutions; and

4.      All of the actions of the Director of Office of Legal Affairs, which actions would have been authorized by the foregoing resolutions except that such actions were taken prior to the adoption of such resolutions, are hereby ratified, confirmed, approved, and adopted as actions taken on behalf of the Company.

The correctness of the above mentioned resolution is hereby confirmed.

Date:   September 12, 2011.

Name: Shoshi Arakawa

Title: Chairman of the Board, CEO and President

Bridgestone Corporation

## ATTACHMENT B

## CORPORATE COMPLIANCE PROGRAM

In order to address deficiencies in its internal controls, policies, and procedures regarding compliance with the Foreign Corrupt Practices Act ("FCPA"), Title 15, United States Code, Section 78dd-1, *et seq.*, and other applicable anti-corruption laws, Bridgestone Corporation ("Bridgestone" or the "company") agrees to continue to conduct, in a manner consistent with all of its obligations under this Plea Agreement, appropriate reviews of its existing internal controls, policies, and procedures.

Where necessary and appropriate, Bridgestone agrees to adopt new, or to modify existing, internal controls, policies, and procedures in order to ensure that it maintains: (a) a system of internal accounting controls designed to ensure that Bridgestone makes and keeps fair and accurate books, records, and accounts; and (b) a rigorous anti-corruption compliance code, standards, and procedures designed to detect and deter violations of the FCPA and other applicable anti-corruption laws. At a minimum, this should include, but not be limited to, the following elements, to the extent they are not already part of Bridgestone's existing internal controls, policies, and procedures:

1.      Bridgestone will develop and promulgate a clearly articulated and visible corporate policy against violations of the FCPA, including its anti-bribery, books and records, and internal controls provisions, and other applicable foreign law counterparts (collectively, the "anti-corruption laws,"), including strong, explicit, and visible support and commitment from senior management to the program.

2.      Bridgestone will develop and promulgate compliance standards and procedures designed to reduce the prospect of violations of the anti-corruption laws and Bridgestone's compliance code and will take appropriate measures to encourage and support the observance of ethics and compliance standards and procedures against foreign bribery at all levels of the company. These standards and procedures shall apply to all directors, officers, and employees and, where necessary and appropriate, outside parties acting on behalf of Bridgestone in a foreign jurisdiction, including but not limited to, agents and intermediaries, consultants, representatives, distributors, teaming partners, contractors and suppliers, consortia, and joint venture partners (collectively, "agents and business partners"), and shall notify all employees that compliance with the standards and procedures is the duty of individuals at all levels of the company. Such standards and procedures shall include policies governing:

        a.      Gifts;

        b.      Hospitality, entertainment, and expenses;

        c.      Customer travel;

        d.      Political contributions;

        e.      Charitable donations and sponsorships;

        f.      Facilitation payments; and

        g.      Solicitation and extortion.

1

3.      Bridgestone will develop these compliance standards and procedures, including internal controls, ethics, and compliance programs on the basis of a risk assessment addressing the individual circumstances of the company, in particular the foreign bribery risks facing the company, including, but not limited to, its geographical organization, interaction with governments, and industrial sector of operation.

4.      Bridgestone shall review its compliance standards and procedures, including internal controls, ethics, and compliance programs, no less than annually, and updated as appropriate, taking into account relevant developments in the field and evolving international and industry standards, and update and adapt as necessary to ensure the continued effectiveness of the company's internal controls, ethics, and compliance programs.

5.      Bridgestone will assign responsibility to one or more senior corporate executives of Bridgestone for the implementation and oversight of compliance with policies, standards, and procedures regarding the anti-corruption laws.  Such corporate official(s) shall have direct reporting obligations to independent monitoring bodies, including internal audit, Bridgestone's Board of Directors, or any appropriate committee of the Board of Directors, and shall have an adequate level of autonomy from management as well as sufficient resources and authority to maintain such autonomy.

6.      Bridgestone will ensure that it has a system of financial and accounting procedures, including a system of internal controls, reasonably designed to ensure the maintenance of fair and accurate books, records, and accounts to ensure that they cannot be used for the purpose of foreign bribery or concealing such bribery.

7.      Bridgestone will implement mechanisms designed to ensure that the policies, standards, and procedures of the company regarding the anti-corruption laws are effectively communicated to all directors and officers, all employees working in Finance, Accounting, Internal Audit, Legal, Compliance, Sales, and Government Relations, all other employees working in positions involving activities implicated by Bridgestone's policies regarding anti-corruption and compliance with the FCPA, and, where appropriate, agents and business partners. These mechanisms shall include:  (a) periodic training for all such directors, officers, employees, agents and business partners; and (b) annual certifications by all such directors, officers, employees, agents and business partners, certifying compliance with the training requirements.

8.      Bridgestone will establish an effective system for:

a.      Providing guidance and advice to directors, officers, employees, and, where appropriate, agents and business partners, on complying with the company's compliance policies, standards, and procedures, including when they need advice on an urgent basis on difficult situations in foreign jurisdictions;

2

      b.      Internal and, where possible, confidential reporting by, and protection of, directors, officers, employees, and, where appropriate, agents and business partners, not willing to violate professional standards or ethics under instructions or pressure from hierarchical superiors, as well as for directors, officers, employees, and, where appropriate, agents and business partners, willing to report breaches of the law or professional standards or ethics concerning anti-corruption occurring within the company, suspected criminal conduct, and/or violations of the compliance policies, standards, and procedures regarding the anti-corruption laws for directors, officers, employees, and, where necessary and appropriate, agents and business partners; and

      c.      Responding to such requests and undertaking appropriate action in response to such reports.

9.      Bridgestone will institute appropriate disciplinary procedures to address, among other things, violations of the anti-corruption laws and Bridgestone's compliance and ethics program by Bridgestone's directors, officers, and employees. The company shall implement procedures to ensure that where misconduct is discovered, reasonable steps are taken to remedy the harm resulting from such misconduct, and to ensure that appropriate steps are taken to prevent further similar misconduct, including assessing the internal controls, ethics, and compliance program and making modifications necessary to ensure the program is effective.

10.      Bridgestone will institute appropriate due diligence and compliance requirements pertaining to the retention and oversight of all agents and business partners, including:

      a.      Properly documented risk-based due diligence pertaining to the hiring and appropriate and regular oversight of agents and business partners;

      b.      Informing agents and business partners of Bridgestone's commitment to abiding by laws on the prohibitions against foreign bribery, and of Bridgestone's ethics and compliance standards and procedures or other measures for preventing and detecting such bribery; and

      c.      Seeking a reciprocal commitment from agents and business partners.

11.      Where appropriate, Bridgestone will include standard provisions in agreements, contracts, and renewals thereof with all agents and business partners that are reasonably calculated to prevent violations of the anti-corruption laws, which may, depending upon the circumstances, include: (a) anti-corruption representations and undertakings relating to compliance with the anti-corruption laws; (b) rights to conduct audits of the books and records of the agent or business partner to ensure compliance with the foregoing; and (c) rights to terminate an agent or business partner as a result of any breach of anti-corruption laws, and regulations or representations and undertakings related to such matters.

12.     Bridgestone will conduct periodic review and testing of the compliance code, standards, and procedures designed to evaluate and improve their effectiveness in preventing and detecting violations of anti-corruption laws and Bridgestone's compliance and ethics programs, taking into account relevant developments in the field and evolving international and industry standards.